WASTE CONVERSION, INC., Stout Environmental, Inc., and Mark Alsentzer, Plaintiffs,

v.

Lana SIMS, Michael B. McKitish, and James J. Rosenberg, Defendants.

Civ. A. No. 91–4312 (JEI).

United States District Court, D. New Jersey.

Nov. 15, 1994.

Rubin, Rubin, Kaplan & Kuhn by David B. Rubin, Piscataway, NJ, for plaintiffs.

Deborah Poritz, Atty. Gen. for N.J. by Matthew R. Gabrielson, Deputy Atty. Gen., Trenton, NJ, for defendants.

**OPINION GRANTING DEFENDANTS McKITISH AND ROSENBERG'S MOTION FOR SUMMARY JUDGMENT AND, UPON RECONSIDERATION, GRANTING DEFENDANT SIMS' MOTION FOR SUMMARY JUDGMENT**

IRENAS, District Judge:

Plaintiff Waste Conversion, Inc. ("Waste Conversion") is a subsidiary of plaintiff Stout Environmental, Inc. ("Stout"). Plaintiff Mark Alsentzer is the President of Stout. (Collectively the "plaintiffs.") Plaintiffs engage in the hazardous waste disposal industry in New Jersey.

Defendants Lana Sims, Michael B. McKitish, and James J. Rosenberg (collectively the "defendants") were all, at various times relevant to this case, either Director or Acting Director of the New Jersey Department of Treasury's Division of Purchase and Property ("P & P"). P & P is the New Jersey government agency responsible for negotiating outside service contracts, such as hazardous waste hauling contracts, on behalf of the state.

Plaintiffs brought this action under 42 U.S.C. § 1983 (1988), alleging that P & P's twenty-six month suspension of plaintiffs' ability to contract with the state infringed their property rights without due process of law. Plaintiffs also appended several supplemental New Jersey state law claims under 28 U.S.C. § 1367 (1988). Plaintiffs sued McKitish and Rosenberg individually, and Sims both individually and in her official capacity as the current director of P & P.

This matter originally came before the Court on defendants Rosenberg and McKitish's motion for summary judgment on plaintiffs' § 1983 claim. The Court then indicated that it would reconsider the March 30, 1993, Opinion and Order denying all defendants' cross-motion for summary judgment on qualified immunity and granting plaintiffs' motion for summary judgment on liability against defendant Sims on the § 1983 claim.

We now find that P & P provided plaintiffs with an adequate opportunity for a hearing, and thus did not infringe their property rights. Even if defendants did violate plaintiffs rights, we would find that defendants are entitled to qualified immunity. Therefore, defendants' motion for summary judgment is granted. Because plaintiffs do not bring any other federal claims, their pendent state law claims are dismissed.

## I. FACTS AND PROCEDURAL HISTORY

Waste Conversion holds a Hazardous Waste Transporter License issued by the New Jersey Department of Environmental Protection ("DEP"). This license allows Waste Conversion to act as a broker for the transportation and disposal of hazardous waste materials generated in New Jersey. Waste Conversion's clients included the State of New Jersey.

On December 2, 1988, the DEP issued an administrative order seeking to revoke Waste Conversion's hazardous waste transporter license, to bar Alsentzer from the hazardous waste industry in New Jersey, and to impose administrative penalties on Waste Conversion. (Witt Aff. at 1a.) [1] Pursuant to the New Jersey Administrative Procedure Act, N.J.S.A. § 52:14B–11 (West supp.1994), Waste Conversion and Alsentzer were given twenty days to request a hearing before an administrative law judge ("ALJ"), which they apparently did. DEP also sent a letter to Rosenberg, then Director of P & P, requesting that Waste Conversion and Alsentzer be "immediately suspended and ultimately dis-

barred from hazardous waste contracting with the State of New Jersey." (Witt Aff. at 37a.)

On September 8, 1989, Rosenberg issued an Order of Suspension suspending Waste Conversion and Alsentzer from contracting with the State of New Jersey "pending the completion of proceeding by the DEP to revoke [Waste Conversion's] waste transporter license and to bar Alsentzer from the waste industry, and pending debarment proceedings by the [P & P]." (Witt Aff. at 39a–40a.) The Order of Suspension also stated that "if debarment proceedings are not commenced within sixty days of the date that [Waste Conversion] and Mark Alsentzer are served with this Order, they shall be given a statement of the reasons for thereafter continuing the suspension and an opportunity for a hearing." (Witt Aff. at 40a.) The Order of Suspension was signed by the New Jersey Attorney General and became effective on September 22, 1989.

P & P did not initiate debarment proceedings within sixty days, nor did it inform plaintiffs [2] of the reasons for its continued suspension. On April 24, 1990, McKitish, Rosenberg's successor, sent Alsentzer a letter informing him that the suspension "will remain in effect pending the outcome of the litigation by DEP." (Witt Aff. at 44a.) The letter also contained a memorandum from DEP setting forth the reasons for the suspension. (Witt Aff. at 45a–53a.) The letter did not inform plaintiffs of their right to a hearing, but plaintiffs did not request a hearing upon receiving the letter, or at any time thereafter.[3]

---

**1.** Citations to "Witt Aff." are to the affidavit of Francis A. Witt, a Stout employee, which plaintiffs originally filed on September 27, 1991, in conjunction with their application for a preliminary injunction.

**2.** P & P suspended only Waste Conversion and Alsentzer, and not Stout. Stout's only role in this litigation, however, is as the parent company of Waste Conversion. Therefore, we will refer to the suspension as affecting "plaintiffs" rather than just Waste Conversion and Alsentzer.

**3.** The parties dispute the impetus of this letter. In support of their motion for summary judgment, defendants produced a letter dated April 23, 1990, from Albert R. Hasbrouck, III, Assis-

tant Executive Director of New Jersey Transit, to McKitish. This letter states that on March 26, 1990, following the lead of P & P, New Jersey Transit suspended Waste Conversion and Alsentzer. The letter then states that on April 2, 1990, New Jersey Transit received a letter from August C. Schultes of Stout alleging that "the NJ TRANSIT suspension was improper since it was based upon a [P & P] suspension which had expired 60 days after its imposition." (Defendants' Ex. 9.) The letter suggests that P & P contact Schultes directly regarding the status of the suspension.

Plaintiffs claim that they had never seen this letter before it appeared in defendants' motion, and contest the origin of McKitish's April 24, 1990, letter. The origin of the letter, however, does not affect our disposition of this motion.

The DEP license revocation hearing before the ALJ began on May 14, 1990, and concluded on July 13, 1990. Due to numerous delays and extensions, the ALJ did not issue a final decision until April 16, 1991, and the Commissioner of DEP did not affirm that decision until November 13, 1991. That decision in large part exonerated plaintiffs: it imposed relatively minimal monetary fines and required plaintiffs to adopt a "corrective plan" addressing certain deficiencies in plaintiffs' way of doing business.

Meanwhile, on September 27, 1991, while the Commissioner of DEP was still reviewing the ALJ's decision, plaintiffs filed the instant action. Plaintiffs complained that P & P had deprived them of their ability to do business with the state for two years without due process of law, and requested monetary and injunctive relief. The case was originally assigned to another judge in this district.

On November 25, 1991, Lana Sims, the Director of P & P, advised plaintiffs that she would lift the Order of Suspension if plaintiffs would agree to abide by certain conditions, including the DEP Commissioner's "corrective plan." Apparently, these conditions were met, and plaintiffs' suspension was lifted sometime thereafter. This decision rendered plaintiffs' request for injunctive relief moot.

Defendants then brought a motion to dismiss plaintiffs' due process claim. In an Opinion dated July 8, 1992, the court held: (1) that the Eleventh Amendment barred plaintiffs' claim for monetary damages against Sims in her official capacity, (Opinion of July 8, 1992, at 7); (2) that New Jersey law created a protected property interest in contracting with the state, (id. at 9); and (3) that plaintiffs were not entitled to a pre-deprivation hearing, (id. at 14). The court then noted that the DEP proceedings would, in themselves, provide adequate post-deprivation process. (Id. at 15). The court refused to dismiss the complaint, however, because it was not clear whether P & P provided the process due "at a meaningful time." (Id. at 16).

Subsequently, plaintiffs moved for summary judgment as to liability on their federal and state law claims, and defendants cross-moved for summary judgment on the basis of qualified immunity. In an Opinion and Order dated March 30, 1993, the court denied all defendants' cross-motions for summary judgment on qualified immunity, granted plaintiffs' motion for summary judgment against defendant Sims as to liability on the § 1983 claim, denied that motion as to defendants Rosenberg and McKitish, and denied plaintiffs' motion for summary judgment on the state law claims.

The court held that plaintiffs' procedural due process rights had been violated. (Opinion of Mar. 30, 1993, at 6). The court also found that the right to a prompt post-deprivation right was "clearly established," and thus defendants were not entitled to qualified immunity. (Id. at 7). Furthermore, summary judgment on liability against Sims was appropriate because, at the time of her tenure, plaintiffs had not had a hearing for twenty-six months, and "a reasonable official standing in Ms. Sims shoes would have known what she was doing violated plaintiffs' rights." (Id. at 9). As to the other two defendants, however, it was unclear whether their acts during their tenure at P & P were unreasonable, and thus summary judgment was inappropriate.

The case was reassigned to this Court by Order dated March 28, 1994. On September 26, 1994, defendants McKitish and Rosenberg filed motions for summary judgment. In an Order dated October 5, 1994, this Court indicated that it would reconsider the March 30, 1993, Opinion and Order insofar as it granted plaintiffs' motion for summary judgment on liability as to defendant Sims, and denied all defendants' cross-motion for summary judgment.

## II. RECONSIDERATION OF THE MARCH 30, 1993, OPINION AND ORDER

Plaintiffs argue that we cannot reconsider the March 30, 1993, Opinion and Order. Plaintiffs premise their argument on two bases: (1) that the denial of qualified immunity was immediately appealable, and that defendants' waiver of the right to interlocutory appeal divests us of jurisdiction to reconsider

the issue, and (2) that the "law of the case" doctrine precludes our reconsideration of the prior court's decision. We reject both arguments.

### A. Waiver of Right to Interlocutory Appeal

■ In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court held that "a district court's denial of a claim of qualified immunity ... is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* at 530, 105 S.Ct. at 2817. The Court reached this conclusion because it found that the doctrine of qualified immunity provides "an *immunity from suit*" as well as a defense to liability. *Id.* at 526, 105 S.Ct. at 2815–16. This immunity, the Court reasoned, is "effectively lost if a case is erroneously permitted to go to trial." *Id.* Thus, if not reviewed after denial, the question could never effectively be reviewed at all, and therefore is appealable under the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corporation*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). 472 U.S. at 527, 105 S.Ct. at 2816.

Defendants did not take advantage of *Mitchell* and appeal to the Third Circuit following the court's denial of qualified immunity on summary judgment. Plaintiffs argue that defendants' failure to pursue this avenue of review effectively waived their right to reconsideration of this issue.

Plaintiffs premise their argument on the Sixth Circuit's decision in *Kennedy v. City of Cleveland*, 797 F.2d 297 (6th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987). In that case, the court held that interlocutory appeals from denials of qualified immunity are subject to "the same temporal limitations that are applicable generally to the perfection of appeals." *Id.* at 301. *See also Kenworthy v. Hargrove*, 826 F.Supp. 138, 142 n. 6 (E.D.Pa.1993). Therefore, failure to take advantage of the right to interlocutory appeal within the thirty day time proscription of Fed.R.App.P. 4(a) waives the right to interlocutory appeal. *Kennedy*, 797 F.2d at 301.

From this, plaintiffs argue that defendants have waived their right to review of the denial of qualified immunity. The time to take interlocutory appeal of this issue has expired, plaintiffs point out, and thus the appellate court could not review the issue at this time. Therefore, plaintiffs argue, the district court lacks jurisdiction to reconsider the issue.

*Kennedy*, however, does not support plaintiffs' argument. That case makes clear that "decisions with respect to dismissal or summary judgment, if adverse, do not preclude the inter-position of the defense of immunity as a defense to liability on the merits." 797 F.2d at 300. Later courts interpreting *Kennedy* have held that while failure to take a timely interlocutory appeal of a denial of qualified immunity may waive that right, it does not waive the right to raise the issue on direct appeal. *Zayas–Green v. Casaine*, 906 F.2d 18, 25 (1st Cir.1990); *Kurowski v. Krajewski*, 848 F.2d 767, 773 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988). Therefore, while defendants may have waived their right to interlocutory appeal of the denial of qualified immunity, they have not waived their right to raise it on direct appeal, or even as a defense on the merits.

Indeed, plaintiffs' argument confuses the notion of an appealable "final decision" under 28 U.S.C. § 1291 with a "final judgment." As *Mitchell* makes clear, the denial of qualified immunity is a "final decision" appealable under the "collateral order" doctrine "notwithstanding the absence of a final judgment." 472 U.S. at 530, 105 S.Ct. at 2817. Courts have noted that "[a]n appeal from an interlocutory order is not one from a final judgment, even if by virtue of *Cohen* it is from a final decision." *Kurowski*, 848 F.2d at 772. While our jurisdiction to reconsider final judgments is generally limited, *see* Fed. R.Civ.P. 59(e), our jurisdiction to reconsider interlocutory orders is not. Therefore, we hold that we have jurisdiction to reconsider the denial of qualified immunity just as we would to reconsider any interlocutory order.

■ We must address separately the effect of the March 30, 1993, Opinion and Order on defendant Sims. As to Sims, the

Opinion and Order not only denied her cross-motion for summary judgment on qualified immunity, but also granted plaintiffs' motion for summary judgment on liability. This outcome, at first glance, appears more "final" than the mere denial of qualified immunity.

Our jurisdiction to reconsider this decision, however, is even more clear than that to reconsider the denial of qualified immunity. Fed.R.Civ.P. 54(b) provides that when a case presents more than one claim for relief, a court "may direct the entry of a final judgment" on less than all of the claims "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." That rule also provides that any other decision on less than all of the claims, "however designated, . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

Here, the court did not direct the entry of the March 30, 1993, Opinion and Order as a "final judgment." The second half of Rule 54(b) makes clear that the district court may reconsider the disposition of one of many claims absent such an entry. Therefore, we have jurisdiction to reconsider this aspect of the Opinion and Order.

### B. Law of the Case Doctrine

Plaintiffs next argue that even if we have jurisdiction to reconsider the court's prior decision, the "law of the case" doctrine precludes us from doing so. Because we address an issue different from the one previously addressed, however, the law of the case doctrine does not apply.

 The law of the case doctrine "limits the extent to which an issue will be reconsidered once the court has made a ruling on it." *Fagan v. City of Vineland,* 22 F.3d 1283, 1290 (3d Cir.1994). *See also Tose v. Greate Bay Hotel and Casino Inc.,* 819 F.Supp. 1312, 1316 n. 8 (D.N.J.1993) (applying law of the case doctrine). The law of the case doctrine is not jurisdictional, but rather recognizes that "as a matter of comity a successor judge should not lightly overturn decisions of his predecessors in a given case."

*Fagan,* 22 F.3d at 1290. The doctrine applies both to transfers from judge to judge in the same district, *see Fagan,* 22 F.3d at 1290; *Tose,* 819 F.Supp. at 1316 n. 8, and to transfers from district to district, *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 165 (3d Cir.1982). For intra-district transfers, the decision to follow the law of the case is within the district court's discretion. *Coca-Cola Bottling Co. v. Coca-Cola Co.,* 988 F.2d 386, 411 & n. 25 (3d Cir.) *("Coke"), cert. denied,* — U.S. —, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993).

In *Fagan,* the Third Circuit held that "[t]he law of the case doctrine operates only to limit reconsideration of the same issue." 22 F.3d at 1290. *Fagan* involved the liability of a municipality and individual police officers for injuries caused during the course of a high-speed police chase. The original judge denied the summary judgment motion of the municipality and the officers. The case was then transferred to another judge within the same district, and the municipality and officers once again moved for summary judgment. The second judge granted this motion. On appeal, plaintiffs argued that the second judge's action violated the law of the case doctrine.

The Third Circuit held that the second judge had discretion to revisit the issue. The court noted that while the original judge addressed the issue under a "reckless or callous indifference" standard, the second judge applied a "shocks the conscience" standard, a standard that the Third Circuit adopted. Therefore, the court held that because the second judge "did not reconsider the same issue decided by [the original judge], the law of the case doctrine posed no obstacle to [the second judge]'s action." 22 F.3d at 1290.

 In this case, the court denied defendants' motion for summary judgment on qualified immunity, and stated that the "specific right at issue" was "the right to a prompt post-deprivation hearing when a right to do business with the state has been suspended by the state without a pre-deprivation hearing." (Opinion of Mar. 30, 1993, at 7). In so holding, the court correctly concluded, and the parties do not dispute,

that P & P must provide a suspended party with the *opportunity* for a prompt post-deprivation hearing. Indeed, the regulations governing P & P suspensions specifically provide for such a hearing. *See N.J.A.C.* § 17:12–6.7.

 In this opinion, however, we do not address the right to a hearing, but rather whether plaintiffs' admitted failure to request a hearing was a waiver of that right or a consequence of some state action or inaction that amounted to a constitutional deprivation. Thus, the law of the case doctrine does not prevent us from reconsidering the court's previous denial of qualified immunity.[4]

### III. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The nonmoving party may not simply rest on its pleadings to oppose a summary judgment motion, but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

### III. DISCUSSION

The Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Although the "very act in question" need not have been previously held unlawful, the right is "clearly established" only if "in light of pre-existing law the unlawfulness [is] apparent." *Id.*

The Third Circuit recently clarified the notion of qualified immunity. The determination of qualified immunity involves "two governing inquiries." *Acierno v. Cloutier,* 40 F.3d 597, 620 (3d Cir.1994) (in banc). First, while a right may be "clearly established" other than through controlling case law directly on point, it must be clear enough that " 'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law,

---

4. We also note that the precise right at issue in a qualified immunity case is a pure question of law, over which the Third Circuit would exercise plenary review. *Acierno v. Cloutier,* 40 F.3d 597, 609 (3d Cir.1994) (in banc). We believe that the law of the case doctrine must be exercised less rigidly when pure questions of law are at issue. Indeed, in *Fagan* itself, both judges addressed the same "issue," but simply applied a different legal standard to the facts at hand. As the Supreme Court has stated, the law of the case doctrine does not limit a court's power, but rather guides its discretion. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Therefore, "it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Id.* at 618 n. 8, 103 S.Ct. at 1391 n. 8. Thus, even if the law of the case doctrine applied here, we would exercise our discretion to reconsider this issue.

that their conduct would be lawful.'" *Id.* (*quoting Good v. Dauphin County Social Servs. for Children and Youth,* 891 F.2d 1087, 1092 (3d Cir.1989)). Second, even where the right is clearly established, government officials are entitled to immunity "'if based on the information available to them they could have believed their conduct would be consistent with those principles.'" *Id.* (*quoting Good,* 891 F.2d at 1092). Thus, qualified immunity protects government officials unless they act in a "plainly incompetent" manner or "knowingly violate the law." *Id.,* at —— n. 16, *24 n. 16 (*citing Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

## A. The Contours of the Right at Issue

We must begin by examining the "contours of the right" at issue. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Plaintiffs allege that defendants deprived them of a property interest without due process of law. Thus, we must first determine whether a property interest is at stake.

■ It is well-settled that property interests are not created by the Constitution, but by independent sources such as state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The previous judge concluded, and we agree, that New Jersey law provides plaintiffs with a property interest in their ability to do business with the state. *See Berlanti v. Bodman,* 780 F.2d 296, 300 (3d Cir.1985); *Department of Labor v. Titan Constr. Co.,* 102 N.J. 1, 17, 504 A.2d 7 (1985). Therefore, we turn to the process due plaintiffs before the state deprived them of this right.

■ The process due is a question of federal, rather than state, law. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985). In determining what process is due, we must consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ Applying this test, the court previously determined that plaintiffs were not entitled to a pre-deprivation hearing. Relying on *Federal Deposit Insurance Corporation v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 1787–88, 100 L.Ed.2d 265 (1988), the court found that New Jersey's "important" interest in protecting the environment, coupled with the evidence adduced in the DEP investigation, warranted a suspension without a prior hearing. (Opinion of July 8, 1992, at 14). We agree with this conclusion, and therefore must decide whether defendants provided plaintiffs with an adequate opportunity for a post-deprivation hearing.

## B. Opportunity for a Hearing

■ "An essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and *opportunity* for hearing appropriate to the nature of the case.'" *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (emphasis added) (*quoting Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)). Plaintiffs claim that P & P's reliance on the DEP proceeding, which dragged on for over twenty-six months, denied them an "opportunity for a hearing" at a "meaningful time." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). We, however, view the issue not as whether P & P's reliance on the DEP proceeding was unreasonable, but as whether P & P did in fact provide plaintiffs with an opportunity for a hearing.

It is undisputed that P & P's Order of Suspension informed plaintiffs they were suspended "pending the completion of proceedings by the DEP … and pending debarment proceedings by [P & P]." (Witt Aff. at 39a–40a.) The Order also stated that if P & P debarment proceedings were not instituted within sixty days of the service of the order,

Waste Conversion and Alsentzer "shall be given a statement of the reasons for thereafter continuing the suspension and an opportunity for a hearing." (Witt Aff. at 40a.)

P & P did not supply plaintiffs with a statement of reasons for their continued suspension within sixty days, but plaintiffs did not request a hearing. The next communication between the parties was McKitish's April 24, 1990, letter to Alsentzer setting forth the reasons for Waste Conversion and Alsentzer's continued suspension. This letter concluded that "consistent with the suspension rules of [P & P], N.J.A.C. 17:12–6.7, these suspensions will remain in effect pending the outcome of the litigation by DEP." (Witt Aff. at 44a.) The letter did not specifically remind plaintiffs of their right to a hearing before P & P, but plaintiffs did not request one in response to the letter. This appears to be the last communication between the parties until the initiation of this lawsuit.

We find that defendants provided plaintiffs with a meaningful "opportunity for a hearing." The Order of Suspension specifically stated that after sixty days, plaintiffs would have an "opportunity for a hearing." Defendants therefore notified plaintiffs of the opportunity for a hearing, but simply failed to inform them that a hearing would be held only upon their request.

In light of plaintiffs' level of sophistication, however, such a detailed explanation was unnecessary. Courts have held that sophisticated parties represented by counsel need not be informed of their right to an administrative hearing, because knowledge of that right may be inferred from the circumstances. Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1097 (1st Cir.1989); Waterman v. Marquette–Alger Intermediate Sch. Dist., 739 F.Supp. 361, 369 (W.D.Mich. 1990). See also United States v. Charles George Trucking Co., 823 F.2d 685, 691 (1st Cir.1987) ("a waiver may be inferred 'from conduct or from a collocation of the circumstances'") (quoting Irons v. Federal Bureau of Investigation, 811 F.2d 681, 686 (1st Cir. 1987)). The circumstances of this case show

that plaintiffs clearly knew of their right to a suspension hearing.

Plaintiffs engage in hazardous waste hauling, one of the most highly regulated industries in New Jersey. See N.J.S.A. § 13:1E–1 to 13:1E–207 (West supp. 1994). At the time of the P & P suspension, plaintiffs were represented by counsel and involved in a complicated DEP investigation. Indeed, plaintiffs requested the DEP license revocation hearing.

Not only did the original Order of Suspension inform plaintiffs of their right to a hearing, but McKitish's April 24, 1990, letter also referred plaintiffs to N.J.A.C. § 17:12–6.7, which states that a party suspended by P & P is entitled to "an opportunity for a hearing if he so requests." N.J.A.C. § 17:12–6.7(a)1.iv (emphasis added). It would be reasonable for plaintiffs, sophisticated parties represented by counsel, to consult the regulation if they questioned the terms of their suspension. Under these circumstances, we cannot say that P & P failed to inform plaintiffs of their right to a suspension hearing.

■ Absent a showing that resort to available procedures would be futile, a plaintiff's due process rights are not violated when he fails to avail himself of known procedures. Maples v. Martin, 858 F.2d 1546, 1551 (11th Cir.1988); Dusanek v. Hannon, 677 F.2d 538, 542–43 (7th Cir.), cert. denied, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982); Alexander v. Kennedy–King College, No. 88–C–2117, 1990 WL 179691, at *6 (N.D.Ill.1990). Because defendants adequately notified plaintiffs of their right to a suspension hearing, and plaintiffs failed to request one, we find that plaintiffs waived their right to a suspension hearing.

■ Furthermore, the only sense in which a P & P suspension hearing could be deemed "futile" is that plaintiffs most likely would have lost. Suspension by P & P may be based on "reasonable suspicion that cause exists." N.J.A.C. § 17:12–6.6(a)3. The allegations of wrongdoing presented by the DEP investigation appear more than adequate to create a "reasonable suspicion" that plaintiffs engaged in prohibited activities.[5] This in

5. The original Order of Suspension states that

plaintiffs were suspended based on a reasonable

itself could defeat plaintiffs' due process claim. *See Carey v. Piphus,* 435 U.S. 247, 260, 98 S.Ct. 1042, 1050–51, 55 L.Ed.2d 252 (1978) (plaintiff may not recover actual damages for a procedural due process violation if it is shown that the result would have been the same had he been afforded due process).

Instead, plaintiffs appear to have made a tactical decision to await the conclusion of the DEP hearing before challenging the P & P suspension. The P & P suspension hearing would have been governed by the "reasonable suspicion" standard, a much lighter burden of proof than the preponderance of the evidence standard the government had to meet in the DEP license revocation hearing. *See In re Polk License Revocation,* 90 N.J. 550, 560, 449 A.2d 7 (1982) ("the usual burden of proof for establishing claims before state agencies in contested administrative adjudications is a fair preponderance of the evidence."). Thus, plaintiffs could have reasonably concluded that they were better off simply awaiting the conclusion of the DEP proceeding before challenging the P & P suspension, especially since the DEP proceeding itself might have provided the "reasonable suspicion" needed to defeat them before P & P.[6]

Plaintiffs' tactical decision succeeded, as they were largely exonerated in the DEP proceeding and the P & P suspension was eventually lifted. Having received a favorable result before the DEP, however, plaintiffs should not be allowed a second bite at the apple through this lawsuit. P & P cannot be liable for failing to provide plaintiffs with a hearing that plaintiffs never requested, probably never wanted, and most likely would have lost.

Plaintiffs also argue that P & P violated their due process rights because it failed to follow its own regulations. While agencies are indeed bound by their own regulations, *see Marshall v. Lansing,* 839 F.2d 933, 943 (3d Cir.1988), every deviation from these regulations does not constitute a violation of due process, *South Cent. Terminal Co. v. United States Dept. of Energy,* 728 F.Supp. 1083, 1096 (D.Del.), *aff'd,* 920 F.2d 27 (Temp.Emer.Ct.App.1990). In this case, any variation from the P & P regulations was minimal, and did not violate due process.

*N.J.A.C.* § 17:12–6.7 governs P & P suspensions. That section states that a suspension order must indicate that, if "legal proceedings are not commenced or the suspension removed within 60 days of the date of such notice, the parties will be given [ ] a statement of the reasons for the suspension and an opportunity for a hearing *if he so requests.*" *N.J.A.C.* § 17:12–6.7(a)1.iv (emphasis added). The Order of Suspension effective September 22, 1989, gave plaintiffs a detailed account of the reasons for the suspension, and although plaintiffs did not receive a more detailed statement of the reasons within 60 days, they did receive this in McKitish's April 24, 1990, letter. Furthermore, there is no indication in the record that P & P would have denied plaintiffs a hearing had they requested one. Thus, P & P did not fail to abide by its own regulations.[7]

suspicion that they had violated laws governing the conduct of a regulated business, *N.J.A.C.* § 17:12–6.2(a)7, had willfully failed to perform in accordance with contract specifications, *N.J.A.C.* § 17:12–6.2(a)9, had a record of unsatisfactory performance in accordance with the terms of contracts, *N.J.A.C.* § 17:12–6.2(a)10, and/or made false representations in a bid or other official document, *N.J.A.C.* § 17:12–6.2(a)12. (Witt Aff. at 38a.) These charges were based on information uncovered during the DEP investigation, which centered on whether Waste Conversion had disposed of hazardous waste generated by from Rollins Environmental Services ("Rollins") at non-hazardous waste facilities, in violation of both state law and its contract with Rollins. (Witt Aff. at 18a–19a.) The P & P Order of Suspension concluded that the "substantial evidence" of misconduct adduced in the DEP investigation "by itself would be sufficient to warrant the suspension of [plaintiffs]." (Witt Aff. at 39a.)

6. *See supra* note 5.

7. Indeed, we are not convinced that the regulations entitled plaintiffs to even this notice. The requirement of a statement of reasons and opportunity for a hearing after 60 days is invoked only if "legal proceedings" are not commenced within this time. Plaintiffs requested an administrative hearing in connection with the DEP license revocation within twenty days of the December 2, 1988, DEP administrative order. Although this hearing did not begin until May 14, 1990, the request for an administrative hearing may constitute the commencement of legal proceedings for

Plaintiffs point out that while DEP gave them detailed notice of how to request a hearing, P & P did not. We find this distinction irrelevant. The DEP license revocation hearing was governed by the New Jersey Administrative Procedure Act ("NJAPA"), *N.J.S.A.* § 52:14B–1 *et seq.*, which sets forth detailed procedures for use in contested license suspensions. *See N.J.S.A.* § 52:14B–9. The P & P suspension order, on the other hand, was not subject to the NJAPA. *See Trap Rock Indus., Inc. v. Kohl,* 59 N.J. 471, 489, 284 A.2d 161 (1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).[8]

Even if a P & P suspension hearing was subject to the NJAPA,[9] this would not change P & P's burden in the proceeding. Because P & P would in all likelihood have met the "reasonable suspicion" necessary to suspend plaintiffs, *Carey v. Piphus* would preclude plaintiffs from recovering for any failure by P & P to abide by its own regulations. Therefore, even if P & P did fail to abide by its own regulations, this violation did not reach constitutional magnitude.

## C. Qualified Immunity

■ We have concluded that defendants did not violate plaintiffs' due process rights because they presented plaintiffs with an adequate opportunity for a hearing. Even if we believed that defendants violated plaintiffs' rights, however, we would find that defendants were entitled to qualified immunity.

Under the first prong of *Acierno,* we must consider whether "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful." 40 F.3d at 620. Although this does not require controlling case law directly on point, we find no federal cases suggesting that a government agency must remind a highly regulated, sophisticated entity, represented by counsel and involved in an administrative proceeding before another agency, that it has a right to request a suspension hearing after the agency has already informed the entity of its right to a hearing.

Plaintiffs cite two cases for the proposition that P & P was obliged to re-inform plaintiffs of their right to a hearing. In *Grandison v. Smith,* 779 F.2d 637 (11th Cir.1986), and *Barkley v. City of Jackson,* 705 F.Supp. 390 (W.D.Tenn.1988), both courts held that an employee's failure to avail himself of grievance procedures did not constitute a waiver when the employer failed to provide " 'fair

the purposes of the regulation. This reading of the regulation is supported by the fact that one ground for suspension and eventual debarment by P & P is "[v]iolation of any laws governing the conduct of ... regulated industries," *N.J.A.C.* § 17:12–6.2(a)7, and that such violation may be determined "by an agency empowered to render such judgment," *N.J.A.C.* § 17:12–6.3(a)4.

Plaintiffs also argue that P & P cannot maintain a suspension for longer than eighteen months, and that their suspension became invalid when it extended beyond that time. The relevant regulation, however, provides that a P & P suspension may not continue beyond eighteen months "unless civil or criminal action regarding the violation shall have been initiated within that period." *N.J.A.C.* 17:12–6.7(a)2. Because the DEP proceeding extended beyond eighteen months, P & P could continue plaintiffs' suspension beyond that time.

We note that our interpretation of these regulations does not govern the due process inquiry, because the process due is governed by federal law. Nonetheless, it does buttress our conclusion that P & P did not disregard its own regulations.

8. Plaintiffs argue that *Trap Rock* has been implicitly overruled by *Berlanti v. Bodman,* 780 F.2d 296 (3d Cir.1985), and *Department of Labor v. Titan Constr. Co.,* 102 N.J. 1, 504 A.2d 7 (1985). Insofar as *Trap Rock* stands for the proposition that parties have no property interest in their ability to contract with the state, we agree. Insofar as it stands for the proposition that temporary suspensions of this right are not subject to the NJAPA, however, we disagree. Both *Berlanti* and *Titan Construction* addressed debarment, rather than suspension. *Berlanti,* 780 F.2d at 300; *Titan Constr.,* 102 N.J. at 17, 504 A.2d 7. Thus, we believe that *Trap Rock's* holding that the procedures of the NJAPA do not apply to temporary suspensions of the ability to do business with the state remains good law.

9. The regulations governing P & P suspension hearings do not set forth specific procedures to be used in those proceedings. At oral argument, counsel for defendants indicated that the Director of P & P may hold a suspension hearing in accordance with the NJAPA, or may conduct a more informal proceeding.

notice [of termination] and an effective opportunity to respond.'" *Barkley,* 705 F.Supp. at 395 (*quoting Grandison,* 779 F.2d at 641).

These cases, however, do not support plaintiffs' position and, if anything, undermine it. First, the cases are factually distinct from the one at hand. In *Grandison,* the defendant failed to notify the plaintiff employees of their termination, and thus did not give them adequate notice of the opportunity for a hearing. 779 F.2d at 642. Similarly, in *Barkley,* the plaintiff, who the employer had deemed mentally incompetent, was told that the circumstances surrounding his termination would not be discussed with him until he received medical authorization of competency. Furthermore, his request for a continuance of a post-termination hearing, of which he received notice only days before it was held, was denied. 705 F.Supp. at 392.

In contrast, plaintiffs in this case were notified of their right to a hearing in the suspension order. For reasons best known to them, they failed to pursue this remedy. Unlike *Grandison* or *Barkley,* there is no indication that P & P purposefully attempted to circumvent plaintiffs' right to a hearing. Indeed, from the record, it appears that P & P would have been perfectly willing to give plaintiffs a hearing. It also appears that plaintiffs decided not to request a hearing because they would have lost under the "reasonable suspicion" standard. Such a tactical decision does not form the basis for a due process claim.

Second, both *Grandison* and *Barkley* recognize that their holdings represent exceptions to the general rule that failure to invoke the right to a hearing waives that right. *See Grandison,* 779 F.2d at 641 ("Failure to request a hearing is deemed a waiver and the due process claim expires."); *Barkley,* 705 F.Supp. at 395 (due process requires "that a meaningful hearing be available if an employee should choose to invoke that right."). This case involves a sophisticated party, in a highly regulated industry, represented by counsel, and P & P did in fact notify plaintiffs of the opportunity for a hearing. Therefore, we cannot say that the holdings of *Grandison* and *Barkley,* even if adopted by the Third Circuit, so squarely govern this case that reasonable officials in defendants' position would have recognized that their actions violated plaintiffs' rights.

The second prong of *Acierno* requires us to consider whether, based on the information available to the official, they would have known that their actions violated plaintiffs' rights. Because plaintiffs never requested a hearing, a reasonable official would see no need to supply them with one. Therefore, defendants are entitled to qualified immunity.

Plaintiffs argue that they assumed that the suspension ended after sixty days, and that the tenor of McKitish's April 24, 1990, led them to assume that P & P would not supply them with a hearing. This argument fails for two reasons. First, the test for qualified immunity is how a reasonable official would act in a given situation, not how a reasonable person would respond to the official's actions. Second, given the plaintiffs' level of sophistication, we find that it was unreasonable for them to infer from McKitish's letter that P & P was unwilling to supply them with a hearing, especially when the letter cited a regulation stating that plaintiffs would be provided with a hearing at their request.

## IV. CONCLUSION

In sum, we hold that defendants did not deny plaintiffs' due process right to an opportunity for a hearing. Furthermore, plaintiffs waived this right by failing to request a hearing after adequate notice by defendants. Finally, even if defendants did violate plaintiffs' due process rights, these rights were not "clearly established," and thus defendants are not liable under the doctrine of qualified immunity.

For these reasons, defendants McKitish and Rosenberg's motions for summary judgment will be granted, and upon reconsideration, defendant Sims' motion for summary judgment will be granted. Because plaintiffs state no other federal claims, their pendent state law claims are dismissed. *See Simmerman v. Corino,* 804 F.Supp. 644, 658 (D.N.J. 1992), *aff'd mem.,* 16 F.3d 405 (3d Cir.1993).

An appropriate order will be entered on even date herewith.